## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 21-14178-CIV-CANNON/MAYNARD

**CRYSTAL MARIE POLINICE,**

      **Plaintiff,**

**v.**

**KILOLO KIJAKAZI, ACTING
COMMISSIONER OF SOCIAL
SECURITY ADMINISTRATION,**

      **Defendant.**
_____/

## REPORT AND RECOMMENDATION

**THIS CAUSE** is before me on Plaintiff's Motion for Summary Judgment [DE 18] and Defendant's Motion for Summary Judgment/Response [DE 21]. Having reviewed the pleadings, and the administrative record, I respectfully **RECOMMEND** that Defendant's administrative decision be **AFFIRMED** for the reasons set forth below.

## BACKGROUND

This case involves a determination of Plaintiff Crystal M. Polinice's ("Plaintiff's") applications for disability insurance benefits and for supplemental security income benefits filed on December 22, 2018. R. 343-45. Plaintiff initially alleged disability beginning on January 1, 2012, due to post-traumatic stress disorder ("PTSD"), depression, anxiety disorder, herniated disc, degenerative disc disease ("DDD"), five bulging discs, spinal stenosis, back problems, inflammatory bowel disease and vascular problems with legs and arms. R. 386.[1]

---

[1] An 894-page certified transcript [DE 13] contains the entire administrative record. The transcript index [DE 13 at page 2-6] identifies each document or set of documents by exhibit number and description. I will cite to the transcript as "R." followed by the page number(s) listed on the index and located at the bottom right-hand corner of each page.

Plaintiff was 29 on her alleged onset date of January 1, 2012, with a high school education and past relevant work as a companion, waitress and babysitter (performed as Light).  R. 33, 53-62, 69-73, 337.  Plaintiff's application was denied initially and upon reconsideration.  R. 244-60, 266-92.  At Plaintiff's request, Administrative Law Judge ("ALJ") Sylvia H. Alonso, held a hearing on August 26, 2020.  R. 43-76.  Plaintiff was represented by Mr. Todd E. Perrotta, Esq. R. 43, 46.  The ALJ issued an unfavorable decision on September 9, 2020, finding Plaintiff not disabled from January 1, 2012,[2] through September 9, 2020.  R. 20-35.

On February 16, 2021, the Appeals Council denied Plaintiff's timely request for review, making the ALJ's decision the final decision of the Commissioner.  R. 1-3.  Plaintiff has exhausted her administrative remedies and now seeks judicial review of the Commissioner's final decision under 42 U.S.C. § 405(g).

## **STANDARD OF REVIEW**

To qualify for Social Security benefits, a claimant must show that she is disabled.  *Ellison v. Barnhart,* 355 F.3d 1272, 1276 (11th Cir. 2003); *Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001); 20 C.F.R. §§ 404.1512(a), 416.912(a).  The Social Security Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A). A "physical or mental impairment" is one that "results from anatomical, physiological, or

---

[2] Although the ALJ's decision states that she finds no disability from January 1, 2012 (R. 35), at the beginning of her decision, she notes that *res judicata* applies to bar Plaintiff's claims adjudicated by a previous ALJ, for which a decision issued on March 24, 2015.  R. 21.  Therefore, the ALJ in the instant action stated that her decision "will only consider the time period from the date of the last [ALJ's] decision regarding disability."  R. 21.

psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 1382c(a)(3)(D).

A disability benefits claim follows a multi-layered process before it can be reviewed in federal court. A claimant first applies to a state agency for disability determinations, 42 U.S.C. § 421(a), after which the claimant is entitled to an evidentiary hearing before an ALJ. *Heckler v. Day*, 467 U.S. 104, 106–07 (1984). An ALJ must perform a "five-step sequential evaluation" to determine if a claimant is disabled. 20 C.F.R. § 404.1520(a)(1). This five-step process determines if a claimant (1) is currently employed; (2) has a severe impairment; (3) has an impairment or combination of impairments that meets or equals an impairment listed in 20 C.F.R. pt. 404, subpt. P, app. 1 (the "Listings"); (4) can perform past relevant work based on a residual functional capacity ("RFC") assessment; and (5) retains the ability to perform any work in the national economy. *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1178 (11th Cir. 2011); *Phillips v. Barnhart*, 357 F.3d 1232, 1237 (11th Cir. 2004). The claimant has the burden of proof through step four and then the burden shifts to the Commissioner at step five. *Washington v. Comm'r of Soc. Sec.*, 906 F.3d 1353, 1359 (11th Cir. 2018); *Hines–Sharp v. Comm'r of Soc. Sec.*, 511 Fed. Appx. 913, 915 n.2 (11th Cir. 2013). If an individual is found disabled or not disabled at any step, further inquiry is unnecessary. 20 C.F.R. § 416.920(a).

A claimant may appeal an ALJ's unfavorable decision to an Appeals Council that must review the case and determine if the ALJ's "action, findings, or conclusion is contrary to the weight of the evidence currently of record." *Heckler*, 467 U.S. at 106-07; 20 C.F.R. § 404.970(a). After completing the foregoing administrative process, a claimant may seek review in federal court. 42 U.S.C. § 405(g); *Ingram v. Comm'r of Soc. Sec. Admin.*, 496 F.3d 1253, 1261 (11th Cir. 2007).

Under governing regulations, the Social Security Administration conducts its "administrative review process in an informal, non-adversarial manner." 20 C.F.R. § 404.900(b). Unlike judicial proceedings, social security administrative hearings "are inquisitorial rather than adversarial." *Washington*, 906 F.3d at 1364 (quoting *Sims v. Apfel*, 530 U.S. 103, 111 (2000)). "Because Social Security hearings basically are inquisitorial in nature, '[i]t is the ALJ's duty to investigate the facts and develop the arguments both for and against granting benefits.'" *Id.* Indeed, "at the hearing stage, the Commissioner does not have a representative that appears 'before the ALJ to oppose the claim for benefits.'" *Id.* (quoting *Crawford & Co. v. Apfel*, 235 F.3d 1298, 1304 (11th Cir. 2000)). "Thus, 'the ALJ has a basic duty to develop a full and fair record. This is an onerous task, as the ALJ must scrupulously and conscientiously probe into, inquire of, and explore for all relevant facts.'" *Id.* (quoting *Henry v. Comm'r of Soc. Sec.*, 802 F.3d 1264, 1267 (11th Cir. 2015)).

On review in federal court, the scope of review is limited to determining if (1) substantial evidence supports the Commissioner's findings, and (2) the correct legal standards were applied. *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004). To make this determination, a reviewing court must "scrutinize the record as a whole to determine if the decision reached is reasonable and supported by substantial evidence." *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983). "Substantial evidence is more than a scintilla, but less than a preponderance. It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Id.*

In testing for substantial evidence, a court may not "reweigh the evidence" or "decide the facts anew." *Winschel*, 631 F.3d at 1178. Instead, so long as the ALJ's findings are supported by substantial evidence, they are conclusive, and the court must defer to the ALJ's decision even if

the evidence preponderates against it.  *Crawford*, 363 F.3d at 1158-59.  However, the court will not "merely rubber-stamp a decision ... [and] must scrutinize the record as a whole to determine if the decision reached is reasonable and supported by substantial evidence."  *Schink v. Comm'r of Soc. Sec.*, 935 F.3d 1245, 1257 (11th Cir. 2019); *see also Simon v. Comm'r, Soc. Sec. Admin.*, 7 F.4th 1094, 1104 (11th Cir. 2021) ("Within this narrowly limited role, however, the federal courts 'do not act as automatons' … '[w]e retain an important duty to 'scrutinize the record as a whole' and determine whether the agency's decision was reasonable") (quoting *MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986)).  Remand is appropriate for further factual development where the record reveals evidentiary gaps that result in unfairness or clear prejudice.  *Washington v. Comm'r of Soc. Sec.*, 906 F.3d 1353, 1358 (11th Cir. 2018).

A reviewing court is also required to review the ALJ's decision to determine if the correct legal standards were applied.  *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997).  If the court finds an error in the ALJ's application of the law, or if the ALJ fails to provide sufficient reasoning for determining that the proper legal analysis has been conducted, then the ALJ's decision must be reversed.  *Cornelius v. Sullivan*, 936 F.2d 1143, 1145-46 (11th Cir. 1991).

## THE ALJ'S DECISION

The ALJ in this case proceeded through the five-step analysis as follows:  At step one, the ALJ found that Plaintiff had engaged in substantial gainful activity ("SGA") during 2018.  R. 23-24.  Even though Plaintiff's 2018 earnings exceeded the SGA threshold, the ALJ found that Plaintiff had not engaged in ongoing SGA.  R. 23.  Therefore, the ALJ proceeded through the five-step evaluation process.  R. 23-24.  At step two, the ALJ found that Plaintiff had the following severe impairments: degenerative disc disease of the lumbar spine, major depressive disorder,

anxiety disorder, and PTSD.[3]  R. 24-25. At step three, the ALJ found that Plaintiff did not have an

impairment or combination of impairments that meets or medically equaled the severity of an

agency-listed impairment in the Listings. R. 25-26.  As a predicate to step four, the ALJ found that

Plaintiff had the RFC to perform work at the light level with the following additional limitations:

Plaintiff could sit for 6 hours in an 8-hour workday and could stand and walk for 6 hours in an 8-

hour workday. R. 27-33.  The ALJ also found that Plaintiff could occasionally climb ramps and

stairs, but never climb ladders, ropes, and scaffolds. R. 27-33.  The ALJ further found that Plaintiff

could frequently stoop and crouch, but only occasionally kneel and crawl. R. 27-33.  The ALJ

additionally determined that Plaintiff could concentrate and persist to complete simple and

repetitive tasks with normal breaks over an 8-hour day. R. 27-33.  Lastly, the ALJ found that

Plaintiff could have occasional interaction with supervisors, coworkers and the public.  R. 27-33.

At step four, based on testimony from a vocational expert ("VE"), the ALJ found that Plaintiff is

unable to perform any past relevant work as a Companion, Waitress, or Babysitter.  R. 33, 69-74.

At step five, based upon testimony from the VE, which the ALJ found to be consistent with

information in the Dictionary of Occupational Titles, the ALJ determined that Plaintiff could

perform the requirements of unskilled, light positions as follows: (1) Marker with 54,000 positions

in the national economy; (2) Cashier II with 200,000 positions in the national economy; and (3)

Cafeteria Attendant with 113,000 positions in the national economy.  R. 33-34, 74.  Therefore, the

ALJ concluded that Plaintiff had not been disabled within the meaning of the Social Security Act

from January 1, 2012, through September 9, 2020.  R. 35.

---

[3] The ALJ also noted that Plaintiff had been diagnosed with irritable bowel syndrome, ulcerative colitis, and vasculitis (inflammation of blood vessels), which were acknowledged by the ALJ but found to be non-severe.  R. 24-25.

## **DISCUSSION**

Plaintiff makes two arguments in her motion for remand:

(1) The ALJ erred by not finding that Plaintiff met the Listings for depressive disorders
and for trauma- and stressor-related disorders, which would render her disabled.

(2) The ALJ failed to fully develop the record.

I will address each of Plaintiff's arguments in turn.

### **A. WHETHER ALJ ERRED BY FAILING TO FIND THAT PLAINTIFF'S MENTAL IMPAIRMENTS MEET OR MEDICALLY EQUAL LISTINGS 12.04 AND 12.15**

Plaintiff argues that she is disabled because she meets Listings 12.04 and 12.15 and that

the ALJ's findings to the contrary are unsupported by substantial evidence.[4] DE 18 at 18-23.

"To 'meet' a Listing, a claimant must have a diagnosis included in the Listings and must

provide medical reports documenting that the conditions meet the specific criteria of the Listings

and the duration requirement." *Wilson v. Barnhart*, 284 F.3d 1219, 1224 (11th Cir. 2002); 20

C.F.R. § 404.1525. The impairment "must meet all of the specified medical criteria. An

impairment that manifests only some of those criteria, no matter how severely, does not qualify."

*Sullivan v. Zebley*, 493 U.S. 521, 530 (1990).

"In determining whether a claimant meets or equals a Listing, '[t]he ALJ must consider the

applicant's medical condition taken as a whole.'" *Albra v. Acting Comm'r of Soc. Sec.*, 825 F.

App'x 704, 706 (11th Cir. 2020) (quoting *Jamison v. Bowen*, 814 F.2d 585, 588 (11th Cir. 1987)).

"The ALJ, however, need not 'cite to particular regulations or cases' or 'mechanically recite the

evidence leading to [the] determination.'" *Id.* (quoting *Jamison*, 814 F.2d at 588-89 and citing

---

[4] The ALJ also considered Listings 1.04 (disorders of the spine) and 12.06 (anxiety and obsessive-compulsive disorders) and determined that Plaintiff did not meet or equal them. R. 25-26; 20 C.F.R. pt. 404, subpt. P, app. 1, §§ 1.04, 12.06.

*Hutchison v. Bowen*, 787 F.2d 1461, 1463 (11th Cir. 1986)).  Therefore, findings from later steps in the ALJ's analysis may be relevant to whether a plaintiff meets or equals a Listing.  For example, "[i]n some cases, the ALJ's finding that a claimant fails to meet a listing may [even] be implied from the record.  *Id.* (citing *Hutchison*, 787 F.2d at 1463 (concluding that, even though the ALJ made no express finding at step three that the claimant met no Listing, the ALJ "implicitly found" that the claimant met no listed impairment where the ALJ proceeded to address steps four and five of the sequential evaluation)); *see also Bailey v. Soc. Sec. Admin., Comm'r*, 782 F. App'x 838, 842-43 (11th Cir. 2019) (holding that ALJ findings that claimant did not meet relevant Listings could be implied because the ALJ proceeded to steps four and five of the sequential analysis, and the ALJ's decision was supported by substantial evidence).

To meet Listing 12.04 (for depressive and other related disorders) and/or 12.15 (for trauma- and stressor-related disorders), Plaintiff must show a qualifying impairment that satisfies the requirements of Paragraphs A and B or A and C of the Listing.  *See* 20 C.F.R. pt. 404, subpt. P, app. 1, §§ 12.00A(2), 12.04, 12.15.  Plaintiff argues that she meets Paragraphs A and B for Listings 12.04 and 12.15.  DE 18 at 18-23.  The ALJ, on the other hand, determined that the criteria for Paragraphs B and C for Listings 12.04 and 12.15 were not satisfied.[5]  R. 26.  Plaintiff does not argue with the ALJ's finding that she does not satisfy Paragraph C criteria.  Thus, even presuming that Plaintiff met Paragraph A criteria, she will not meet or equal a listing if she does not satisfy Paragraph B criteria.

---

[5] The ALJ determined that the criteria for Paragraph B and Paragraph C were not met but did not address the requirements of Paragraph A.  She did not need to, given her conclusions regarding Paragraph B and Paragraph C. Because I find the ALJ committed no error in her assessment of the Paragraph B and Paragraph C criteria, there is no need to address Paragraph A further here.

Listings 12.04 and 12.15 contain the same Paragraph B criteria.  Paragraph B can be satisfied by showing at least one extreme limitation or two marked limitations in the following areas of mental functioning: (1) understanding, remembering, and applying information; (2) interacting with others; (3) concentrating, persisting, or maintaining pace; and (4) adapting or managing oneself.  20 C.F.R. pt. 404, subpt. P, app. 1, § 1200A(2)(b).  A claimant has a marked limitation when the claimant's functioning in this area independently, appropriately, effectively, and on a sustained basis is seriously limited. 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00F(2)(d).  A claimant has an extreme limitation when the claimant cannot function in this area independently, appropriately, effectively, and on a sustained basis.  20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00F(2)(e).

Plaintiff argues that she meets Paragraph B criteria because she has an extreme limitation in the second area of mental functioning: interacting with others.  DE 18 at 20.  The ALJ determined, however, that Plaintiff had only a moderate limitation in this area.[6]  R. 25.

### 1.  The Evidence the ALJ Considered Regarding Interacting with Others

The ALJ's opinion demonstrated that she considered the entire record in evaluating Plaintiff's mental impairments.  R. 25-33.  With respect to interacting with others specifically, the ALJ stated the following:

> In interacting with others, the claimant has a moderate limitation. The record, which shows that the claimant has been described as having appropriate mood and affect, poor to fair/normal judgment, good eye contact, normal speech and occasionally impaired mood supports the undersigned's finding of moderate limitation in this area of mental functioning. The claimant has also presented as guarded with severely depressed and anxious mood and a wide range of emotional expression with tears during a 2012 consultative examination at which time she reported she isolated herself from others except she spoke on the phone with her ex-boyfriend. (Ex. B1F at 4-5; B6F, B12F, Ex. B13F at 2; B14F, B16F, B17F, B21F, B22F).

---

[6] The ALJ determined that Plaintiff had a mild limitation in areas one and four and a moderate limitation in areas two and three.  R. 25-26.

R. 25.  While this summation by the ALJ fairly and accurately characterized the cited medical records, a more detailed recounting of the records is instructive.

The records the ALJ cited begin with a consultative examination by Carol Seidman, Ph.D. on January 17, 2012.[7]  R. 510-14.  Dr. Seidman noted, among other things, that Plaintiff "was poorly groomed in her pajamas."  R. 512.  There were "disharmonies between affective expression and thought contact [sic]."  *Id.*  "Eye contact was normal."  *Id.*  Dr. Seidman's observations regarding social functioning were as follows:

> The client reported that she does not have the capacity to interact independently, effectively and on a sustained basis with others.  She speaks on the phone to her x boyfriend but isolates herself from all others.  She does not get along with family members and others.  There is a history of avoidance of interpersonal relationships and social isolation.  Social functioning in work situations may involve interactions with the public, and responding appropriately to persons in authority or being cooperative with coworkers.  Recreational activities included watching television. Social isolation and withdrawal are reported with avoidance of others.  She does not attend church on a regular basis.  "I am always crying and don't want to be around people", she sobs.  Her record indicates that she attends NA meetings at times.

*Id.*

Records at B6F and B17F document Plaintiff's near-monthly visits to Medical Management of Broward, Inc. from September 2016 through June 2020 for pain management. R. 569-92, 691-778.  Lenard Harman, D.O. treated Plaintiff for chronic pain in her neck and low back.  *Id.*  Beginning in August 2017, Dr. Harmon noted that Plaintiff's pain medications were

---

[7] Dr. Seidman noted, among other things, that Plaintiff's "issues with depression and anxiety with panic attacks began around the age of 12.  [Plaintiff] stated that she was raped when she was very young and she has repeated flashbacks. She also stated that her brother who has Bipolar Disorder was physically abusive to her."  R. 511.  Dr. Seidman noted that Plaintiff had weekly therapy sessions from age 12 until 19 and had been treated by a psychiatrist since age 12. The psychiatrist had prescribed psychotropic and antipsychotic medications.  *Id.*  Further, Plaintiff was hospitalized under the Baker Act at 16 years old and hospitalized again at nearly 28 years old when she attempted suicide by ingesting 52 Xanax pills.  *Id.*

reducing her chronic severe pain and "allowing her to be independent in performing her activities of daily living." R. 715, 718, 720, 723, 725, 727, 729 731, 733. Beginning in May 2018 and continuing thereafter, Dr. Harmon noted that Plaintiff's "chronic severe pain is reduced *significantly* [by current pain medications] allowing her to be independent in performing her personal and maternal [activities of daily living]." R. 569-92, 735-78 (emphasis added). In addition, each of Dr. Harman's monthly exams after his initial exam included his statement that "[i]t is my judgment as a Board Certified Pain Physician, that chronic opioid treatment is necessary both now and into the foreseeable future, based on my ongoing monthly reevaluation of this patient."[8] *Id.*

Records at B12F indicate that, on October 16, 2019, Sharmaine LaFleur, Licensed Mental Health Counselor ("LMHC") at Suncoast Mental Health Center, Inc. performed a biopsychosocial assessment of Plaintiff. R. 634-42. LMHC LaFleur noted that Plaintiff presented with concerns of depression and anxiety and believed that she needed counseling. R. 634. LMHC LaFleur observed that Plaintiff's appearance was appropriate, her overall hygiene was good, her eye contact was good, rapport with Plaintiff was easily established, and Plaintiff's speech was appropriate. *Id.* LMHC LaFleur also noted that Plaintiff's behavior was negativistic. R. 635. Plaintiff reported that her current medications were Xanax and Wellbutrin. R. 637. In response to questions about her employment history, Plaintiff responded that she was a waitress for many years but that it was currently hard to be on her feet for a long period of time. R. 639. In response to questions about her development history, Plaintiff reported that her social development, which was described as "Getting Along With Peers," was the "[s]ame as [o]thers." R. 638. Furthermore, Plaintiff reported

---

[8] Records at B15F document Dr. Harmon's treatment notes for Plaintiff's March 3, 2020 visit, which are consistent with the above. R. 670-72. Treatment notes at B21F document Dr. Harman's examination of Plaintiff on 6/29/2020, with updated prescriptions for Ibuprofen and Percocet. R. 849-50.

that for recreation she went to the beach alone and with friends but that she had anxiety and felt overwhelmed around new people.  R. 641.  Plaintiff also reported that she had problems making friends and not keeping friends.  *Id.*  LMHC LaFleur noted that Plaintiff's "prognosis is good, no barriers foreseen."  *Id.*  LMHC LaFleur further noted that the treatment plan was for outpatient therapy and a psychiatric evaluation.  R. 642.  One of Plaintiff's individualized treatment goals was to receive medication management.  R. 646.

Records at B12F also reflect that, on October 22, 2019, Plaintiff visited with Sang-Wahn Koo, M.D. at Suncoast Mental Health Center, Inc.  R. 652.  Plaintiff reported that she recently moved to Saint Lucie County and was taking Wellbutrin and Xanax.  R. 652.  Dr. Koo's mental status observations of Plaintiff were unremarkable.  R. 655.  Dr. Koo noted that: "Pt left the clinic as the writer informed her that Xanax would not be prescribed by the writer."  R. 656.

Records at B13F document that, on October 24, 2019, Advanced Registered Nurse Practitioner ("ARNP") Rochelle Boyd at DRT Behavioral Services, PLLC in Fort Lauderdale, Florida performed an initial medical evaluation of Plaintiff.  R. 659.  Plaintiff explained that "[she] moved to Port St. Lucie and need[ed] a new Psychiatrist."  *Id.*  Current stressors noted were "not having medication" and the goal for treatment was noted as "get back on medication."  *Id.*  ARNP Boyd observed that Plaintiff was neatly dressed, well-groomed and had appropriate mannerisms and facial expressions.  R. 660.  She was alert and focused, walked independently with gait steady and even but hand tremors were noted.  *Id.*  Plaintiff's speech was clear and coherent.  *Id.*  She was talkative and fidgety.  *Id.*  Her mood was recorded as "'concerned' according to patient" with affect noted as "congruent with mood."  *Id.*  Her thought processes were logical and coherent.  *Id.*  She was not distracted, her memory was intact, but her insight and judgment were noted as poor.  *Id.*  Plaintiff reported that she was living with her mother and daughter, and her noted hobbies were to

"dance and sing." *Id.*  ARNP Boyd prescribed medications, including Wellbutrin with a note stating "[w]ill wean off Xanax." R. 661.  ARNP Boyd also noted a "[l]engthy discussion with patient about overuse of benzos[9] … [s]low taper discussed … [p]atient agrees to plan of care." *Id.*

Records at B14F indicate that, on October 31, 2019, Plaintiff visited with Kristina Truong, D.O. at Heart and Family Health Institute in Port St. Lucie, Florida to establish primary care. R. 663.  Dr. Truong referred Plaintiff to Stuart New Horizons for psychiatric services to evaluate and treat PTSD, anxiety, and depression. *Id.*

Records at B16F document two visits to Heart and Family Health Institute in November 2019 and January 2020. R. 674-89.   On November 19, 2019, Plaintiff visited with Dr. Jared M. Bump, D.O. regarding a magnetic resonance imaging ("MRI") request.  Dr. Bump noted that Plaintiff was alert, in no apparent distress, pleasant, well developed, well nourished and cooperative. R. 679.  Dr. Bump also observed that Plaintiff had good eye contact, had appropriate mood and affect and had normal insight and judgment. *Id.*  On January 16, 2020, Karla R. Hoover, D.O. examined Plaintiff and noted that Plaintiff reported that she "h[ad] exposure to her friend's son who had flu, 2 days ago." *Id.*  Plaintiff reported having a sore throat and low grade fever. R. 675.  Plaintiff asked to get a prescription for Xanax, and Dr. Hoover noted: "[Plaintiff] was to follow [up] with psychiatry and reports that she is to see them … however she will not be able to see psychiatry until March." R. 674.  Plaintiff tested negative for flu and strep, was offered Tamiflu, which she declined, and was advised to rest and drink fluids. R. 675.  Plaintiff was "given new script to see if she could get in to see psychiatry sooner than in March." R. 676.  Findings from Dr. Hoover's examination of Plaintiff were otherwise unremarkable. R. 674-76.

---

[9] Benzodiazepines, or benzos, of which Xanax is one, work to calm or sedate a person.  https://nida.nih.gov/research-topics/opioids/benzodiazepines-opioids (last visited Sept. 5, 2022).

Records at B22F document Plaintiff's exams and evaluations at Legacy Behavioral Health Center, Inc. ("Legacy") in Port St. Lucie, Florida in April and May 2020.  R. 852-79.  A screening examination and Functional Assessment Rating Scale ("FARS") form was completed on April 18, 2020 by Licensed Mental Health Counselor ("LMHC") Pilar Greto.  R. 861-68.  LMHC Greto noted that Plaintiff was neat and clean, oriented to person, place and time, had a neutral mood with congruent effect and was cooperative.  R. 862.  Plaintiff reported that her doctors recommended back surgery, and Plaintiff said: "but I don't want to."  R. 864.  Plaintiff also reported that she had social anxiety, chronic depression and PTSD.  R. 866.  Plaintiff described that "when … not on … medications it's pretty bad and when [she is] on the medications it works and [she is] functional." *Id.*  LMHC Greto rated Plaintiff's depression and traumatic stress as moderate/severe problems and rated as her anxiety as a moderate problem.  R. 861.  Further, LMHC Greto rated as slight to moderate Plaintiff's problems with interpersonal relationships and rated her family relationships as less than a slight problem.  *Id.*  LMHC Greto recommended individual therapy and psychiatric services.  R. 866.

On May 14, 2020, Subhash Tiwari, M.D. with Legacy completed Plaintiff's Psychiatric Evaluation.  R. 870-74.  Dr. Tiwari diagnosed Plaintiff with Major Depressive Disorder Single Episode Moderate and stated that "patient is to go back on Wellbutrin XL 150 mg a day, and Xanax 0.5 mg 1 daily when necessary, total of 15 per month, to be given on a temporary basis.  She is to return for individual psychotherapy [and] will see me in follow-up in 4-6 weeks."  R. 874.

On May 15, 2020, Licensed Marriage and Family Therapist ("LMFT") Diane Craver with Legacy completed Plaintiff's Bio-Psychosocial assessment.  R. 852-60.  LMFT Craver noted that Plaintiff reported having social anxiety, chronic depression and PTSD.  R. 853.  *Id.*  LMFT Craver noted as strengths: "Home aide," and abilities as: "Helping others."  *Id.*  LMFT Craver also noted

that Plaintiff's needs were: "positive coping skills" and that Plaintiff preferred home sessions for treatment. *Id.* LMFT observed that Plaintiff's appearance was appropriate, that her speech was within normal limits, that her mood was within normal limits and that Plaintiff was oriented to time, place and person. R. 854. LMFT Craver further noted that Plaintiff had an adequate support system and had described that "[her] Mom is amazing" and also noted support from an older brother and sisters, from her daughter, from a significant other and from a best friend who "just moved here." R. 855. Plaintiff reported that her best friend lived with her in her mother's home, and she had "a handful of friends, a small amount." R. 858. Plaintiff also reported that "[she] love[s] to dance & listen to music" and that she "[t]akes walks, likes the beach." *Id.* LMFT Craver's impression included the following:

> After [a] variety of trials over the years [Plaintiff] has been treated with Wellbutrin XL with success. Recently her family physician stopped giving her the medications[.] [S]he has made an appointment at Legacy for further treatment. Having been off medication for 3 weeks[, s]he reports regions [sic] of her nightmares, and ability to leave home, panic attacks, tendency to cry.

R. 859. The Plan was for Plaintiff to have individual/family therapy in the home and office. On June 3, 2020, LMFT Craver noted that "[c]lient is being transitioned to psychiatric services only because she could not follow through on therapy appointments." R. 876.

### 2. Application of Paragraph B, Area Two: Interacting with Others

This area of mental functioning encompasses the ability to relate to and work with supervisors, co-workers, and the public. 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00E(2). Several examples illustrate the nature of this mental functioning area. Cooperating with others; asking for help when needed; handling conflicts with others; stating one's own point of view; initiating or sustain[ing] conversation; understanding and responding to social cues (physical, verbal and emotional); responding to requests, suggestions, criticism, correction, and challenges; and keeping

social interactions free of excessive irritability, sensitivity, argumentativeness, or suspiciousness are such examples. *Id.*

The evidence that the ALJ cited and discussed supports that Plaintiff had no more than a moderate limitation in interacting with others for several reasons. R. 25-26, 29, 32. First, the evidence indicates that Plaintiff's ability to interact with others is not as severely impaired as she argues. At her hearing, Plaintiff testified in answer to the ALJ's question about "problems getting along with or dealing with other people" that she did "[n]ot really [have problems] getting along with [people], but … [she] generally tr[ied] to stay by [her]self or [with her] daughter." R. 66. She said that she did not really do a lot. *Id.* Consistent with demonstrating an ability to interact, the evidence detailed above shows that Plaintiff reported having friends and reported having family as a support network. Furthermore, Plaintiff herself reported "No problem" getting along with authority figures. R. 456. Moreover, Plaintiff's work history as a waitress and home health aide suggests that her limitation in interacting with others is not as severe as alleged. R. 28 (citing R. 354-56, 362-71).

Second, the record evidence demonstrates that Plaintiff's symptoms resulting from her mental impairments were managed through medication. R. 859, 866. Indeed, in discussing her depression in April 2020, Plaintiff said "when I am on the medications it works and I am functional." R. 866. Also, notes regarding psychiatrist Maximo R. Monterrey, M.D.'s monthly examinations of Plaintiff from September 2018 through May 2019 generally indicate that Plaintiff was "stable" on her medications through this period of time. R. 566-68.

Third, the evidence supports the ALJ's finding that Plaintiff's mood was only "occasionally impaired." R. 25. Indeed, the above detailed evidence supports the ALJ's finding that Plaintiff was described on several occasions as having appropriate mood and affect. *Id.* This is further

evidence that Plaintiff's limitation pertaining to her ability to interact with others is moderate rather than severe.

Fourth, despite treatment notes from October 2019 indicating that Plaintiff had a good prognosis presuming she engaged in psychotherapy, the record does not indicate that Plaintiff availed herself of such therapy.  R. 641.  In fact, treatment notes from June 2020 indicate that Plaintiff failed to follow through with such therapy.  R. 876.

Accordingly, substantial evidence supports the ALJ's position that Plaintiff had no more than a moderate limitation in interacting with others.  Plaintiff does not meet the requirements of Paragraph B, and Plaintiff did not argue with the ALJ's finding that she fails to satisfy Paragraph C criteria for Listings 12.04 and 12.15.  Therefore, the ALJ's step three finding that Plaintiff does not meet a Listing is due to be affirmed.

### B.  WHETHER ALJ ERRED BY FAILING TO FULLY DEVELOP THE RECORD AS TO PLAINTIFF'S LIMITATIONS RESULTING FROM HER NECK AND BACK IMPAIRMENTS

Plaintiff's argument that the ALJ failed to fully develop the record lacks merit.  Plaintiff grounds her contention regarding failure to develop the record on an October 10, 2019 visit to the emergency room following a motor vehicle accident.  DE 18 at 12, 24-25 (citing R. 670-72, 685, 687, 849-50).  Plaintiff argues that "she experienced an increase in the pain … and an MRI showed 'multilevel degenerative changes' in cervical spine and other increased damage to that area."  DE 18 at 24-25 (citing R. 670-72, 685-87, 849-50).

Plaintiff contends that, due to the accident, the ALJ was required to seek additional information.  DE 18 at 25.  Indeed, Plaintiff argues the ALJ needed to obtain a function report from Dr. Harmon or a consultative orthopedic examination to determine "whether [Plaintiff's] pain

medication ha[d] been dropped back to the original dosage, or [whether] the trauma from the …accident … exacerbated [her] pain based on damage to her spine." *Id.*

"'In fulfilling his duty to conduct a full and fair inquiry, the administrative law judge is not required to order a consultative examination unless the record establishes that such an examination is necessary to enable the administrative law judge to render a decision.'" *Holladay v. Bowen*, 848 F.2d 1206, 1210 (11th Cir. 1988) (quoting *Ford v. Sec'y of Health & Hum. Servs.*, 659 F.2d 66, 69 (5th Cir. 1981)). Absolute certainty regarding the ALJ's decision is not necessary; rather, "it requires only substantial evidence to sustain [it]." *Id.*

Here, the ALJ did not need to further develop the record. Substantial evidence supports the ALJ's conclusion that Plaintiff's condition following the accident on October 10, 2019, was "not debilitating." R. 30 (citing R. 838).

An emergency provider report after the accident stated that Plaintiff reported her speed was slow—turning out of the gas station when rear-ended by semi-tractor-trailer—and upon impact, her windshield remained intact, and her airbag did not deploy. R. 838. Plaintiff did not lose consciousness. R. 833. The ALJ noted that Plaintiff was released the same day after "largely normal objective examination findings." *Id.* Although Plaintiff had cervical strain and right shoulder pain, she had full range of motion and painless range of motion of the back without any paraspinal tenderness.[10] R. 30 (citing R. 836). The ALJ also observed that cervical spine x-rays performed this date demonstrated "disc space narrowing and osteophyte formation at C4-5, C5-6, and C6-7.[11] R. 30 (citing R. at 827, 833). Alex N. Vennos, M.D. indicated that the cervical spine

---

[10] Treatment notes confirmed a secondary impression of cervical strain and right shoulder pain after a first impression of "motor vehicle collision." R. 838.

[11] Osteophytes are bone spurs that can result in inflammation leading to pain. https://www.spine-health.com/conditions/arthritis/bone-spurs-osteophytes-and-back-pain (last visited Sept. 6, 2022).

x-rays revealed "[d]egenerative changes" and "[n]o acute cervical spine fracture or spondylolisthesis."[12]  R. 827.

Furthermore, the ALJ discussed Plaintiff's follow up examination and MRIs performed on November 19, 2019.  R. 30.  With respect to Plaintiff's back, Dr. Bump observed "normal range of motion of spine" and noted "no significant abnormalities."  R. 679.  In addition, Dr. Bump reported that Plaintiff's neck was supple and non-tender with no lymphadenopathy[13] and no jugular vein distention.  *Id.*  A lumbar spine MRI reflected a hemangioma formation at L1,[14] and disc protrusions at L4-5 and L5-S1.  R. 30 (citing R. 685).  A cervical spine MRI reflected:

> Multilevel degenerative changes of the cervical spine, which are more pronounced at the C4-5 level demonstrating a prominent right paracentral disc extrusion impinging upon the thecal sac and spinal cord causing moderate spinal canal stenosis and bilateral neural foraminal narrowing, severe on the right.  There is questionable spinal cord signal abnormality/edema.  No acute osseous findings.

R. 30; R. 687.  The ALJ found the radiological findings to be consistent with Plaintiff's October 2019 cervical spine x-rays showing degenerative changes of disc space narrowing and osteophyte formation and not changes due to her motor vehicle accident.  R. 30.

Moreover, as the ALJ observed, Plaintiff reported as recently as June 2020 that her pain medications were reducing her chronic severe pain.   R. 30.  Indeed, Plaintiff's pain management records support the ALJ's determination that Plaintiff's pain reduction continued after her accident allowing her to be independent in her activities of daily living.  *Id.*

---

[12] Spondylolisthesis occurs when a vertebra slips out of place into the vertebra below, which may put pressure on a nerve and cause pain. https://my.clevelandclinic.org/health/diseases/10302-spondylolisthesis (last visited Sept. 6, 2022).

[13] Lymphadenopathy is a medical term for swollen lymph nodes, which may indicate illness or infection. https://my.clevelandclinic.org/health/diseases/15219-swollen-lymph-nodes (last visited Sept. 6, 2022).

[14] Hemangioma is the most common tumor of the spine and is typically benign. https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5088736/ (last visited Sept. 6, 2022.

Substantial evidence supports the ALJ's conclusion that Plaintiff's October 2019 accident was "not debilitating" based upon her November 2019 follow up examination and MRI's and her continued and effective pain management.  As such, notwithstanding Plaintiff's contention otherwise, the ALJ had no need to further develop the record in this regard.

## CONCLUSION

Upon consideration of the parties' submissions and the administrative record, I find that Plaintiff failed at the administrative level to carry her burden to demonstrate that she met a Listing based on her mental impairments.  Furthermore, I find that Plaintiff failed to carry her burden to demonstrate that the ALJ lacked sufficient information to assess her RFC following her motor vehicle accident in October 2019.  Accordingly, Defendant's administrative decision is supported by substantial evidence and should be affirmed.  I thus respectfully **RECOMMEND** that Defendant's final administrative decision be **AFFIRMED**; that Plaintiff's Motion for Summary Judgment [DE 18] be **DENIED**; that Defendant's Motion for Summary Judgment [DE 21] be **GRANTED**; and that a final judgment be entered in Defendant's favor.

## NOTICE OF RIGHT TO OBJECT

To promote judicial economy and finality to the parties, a prompt resolution is required. As such, I find it necessary and appropriate to shorten the time for any objections pursuant to Southern District of Florida Magistrate Judge Rule 4(a).  Accordingly, the parties shall have SEVEN (7) DAYS from the date of being served with a copy of this Report and Recommendation within which to file written objections, if any, with U.S. District Judge Aileen M. Cannon.  *See* 28 U.S.C. § 636(b)(1)(C); S.D. Fla. Mag. J. R. 4(a).  Failure to file objections timely shall bar the parties from a *de novo* determination by the District Judge of an issue covered in the Report and Recommendation and shall bar the parties from attacking on appeal unobjected-to factual and legal

conclusions contained in this Report and Recommendation.  *See* 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140, 149 (1985); *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989); 11th Cir. R. 3-1 (2016).  **Conversely, if a party does not intend to object to this Report and Recommendation, then that party shall file a Notice of such within five (5) days of the date of this Report and Recommendation.**

**DONE AND RECOMMENDED** in Chambers at Fort Pierce, Florida, this 9th day of September, 2022.

SHANIEK MILLS MAYNARD
U.S. MAGISTRATE JUDGE

.